USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   MAR 28 2012

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) Civil Action No. 11-cv-5191 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) ███████ **ORDER FOR ENTRY** |
| | ) **OF DEFAULT JUDGMENT,** |
| ANTHONY J. KLATCH II; AMERICAN | ) **PERMANENT INJUNCTION, AND** |
| PRIVATE EQUITY, LLC; ARM CAPITAL | ) **OTHER EQUITABLE RELIEF** |
| MANAGEMENT, LLC; TASK CAPITAL | ) **PURSUANT TO FEDERAL RULE OF** |
| MANAGEMENT, LLC; VIGILANT | ) **CIVIL PROCEDURE 55(b)** |
| CAPITAL MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

1.      On July 27, 2011, Plaintiff U.S. Commodity Futures Trading Commission

("Plaintiff," "Commission," or "CFTC") filed a Complaint against defendants Anthony J. Klatch

II ("Klatch"); American Private Equity, LLC ("APE LLC"); ARM Capital Management, LLC

("ARM Management"); TASK Capital Management, LLC ("TASK Management"); and Vigilant

Capital Management, LLC ("Vigilant Management") (collectively "Defendants").  The

Complaint alleges violations of Sections 4b(a)(2)(i) and (iii), 4o, and 4c(b) of the Commodity

Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2)(i) and (iii), 6o, and 6c(b); Sections 4b(a)(1)(A)

and (C), of the Act, as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No.

110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), § 13102-13204, 122 Stat.

1651 (enacted June 18, 2008), to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C); and

Commission Regulations 33.10(a) and (c), 17 C.F.R. §§ 33.10(a) and (c) (2011).  Service of the

Complaint was perfected on all Defendants on or before August 2, 2011. Therefore, Defendants' Answers were due no later than August 23, 2011. No Defendants have filed Answers to the Commission's Complaint.

2.      The Commission now has submitted its Motion for Default Judgment, Permanent Injunction, and Other Equitable Relief Pursuant to Federal Rule of Civil Procedure 55(b) and Memorandum in Support ("Default Motion"). The Court has considered carefully the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Default Motion, and all exhibits in support thereof, and being fully advised, hereby:

3.      **GRANTS** the Commission's Default Motion and enters the following findings of fact and conclusions of law finding Defendants liable as to all violations as alleged in the Complaint. Accordingly, the Court now issues the following Order for Entry of Default Judgment, Permanent Injunction, and Other Equitable Relief Pursuant to Federal Rule of Civil Procedure 55(b) ("Order"), which determines that Defendants have violated Sections 4b(a)(2)(i) and (iii), 4o, and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), 6o, and 6c(b); Sections 4b(a)(1)(A) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C); and Commission Regulations 33.10(a) and (c), 17 C.F.R. §§ 33.10(a) and (c) (2011).

## I.      PROCEDURAL HISTORY

4.      On July 27, 2011, the Commission filed under seal a Complaint and Emergency *Ex Parte* Motion and Memorandum in Support for Statutory Restraining Order, Expedited Discovery, Preliminary Injunction, and Other Equitable Relief ("SRO Motion"). This Court, after considering the Commission's SRO Motion, signed an Order Granting Plaintiff's Emergency *Ex Parte* Motion for Statutory Restraining Order, Expedited Discovery, Preliminary

Injunction, and Other Equitable Relief ("SRO") (Dkt. No. 9) against all Defendants. The SRO, *inter alia*, froze all assets of Defendants, authorized inspection of Defendants' books and records, and placed the corporate Defendants under the temporary receivership of Mark Silverio ("Receiver"). The SRO required Defendants to show cause why a preliminary injunction should not be entered against Defendants. Defendants did not file any papers in opposition to Plaintiff's motion for preliminary injunction.

5.      The Commission effected service on all Defendants on or before August 2, 2011. No Defendants have filed any responsive pleadings. The only pleading filed on behalf of any Defendant was a motion to stay the proceedings filed by Klatch, which this Court denied on November 14, 2011.

6.      On December 1, 2011, this Court entered an Order of Preliminary Injunction against Defendants (Dkt. No. 25), finding that the Commission had presented a *prima facie* case that Defendants have violated provisions of the Act, the Act as amended by the CRA, and the Regulations.

7.      In a separate but related criminal matter, on October 28, 2011, Klatch pled guilty to charges of securities fraud, wire fraud, money laundering, and conspiracy in the Southern District of Alabama relating to his involvement in TASK Management and TASK Capital Partners, LP (the "TASK Pool"). The plea agreement specified that money in the TASK Pool was moved to Klatch's personal account, via a series of transactions that Klatch knew were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds. Further, as part of the plea agreement, Klatch admitted his involvement in similar fraudulent schemes involving APE LLC, ARM Management, and Vigilant Management. Klatch is currently awaiting sentencing.

3

## II.    FINDINGS OF FACT

**A.    Jurisdiction and Venue**

8.    This Court has jurisdiction over the parties and over the subject matter of this action pursuant to Section 6c of the Act, to be codified at 7 U.S.C. § 13a-1.

9.    Venue lies properly within this District pursuant to Section 6c(e) of the Act, to be codified at 7 U.S.C. § 13a-1(e).

**B.    Parties**

10.    **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, the Act as amended by the CRA, and the Regulations promulgated thereunder.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

11.    **Anthony J. Klatch II** resided in Tampa, Florida; he is currently in jail in Alabama.  He was the investment manager for the Pools and Managing Director and Chief Investment Officer of ARM Management, TASK Management and Vigilant Management.  Klatch has never been registered in any capacity with the Commission.

12.    **American Private Equity, LLC** is located at 1999 Avenue of the Stars, Los Angeles, CA.  Until his death in April 2011, Timothy M. Sullivan ("Sullivan") was the manager and member of APE LLC.  APE LLC was a manager for ARM Management and TASK Management.  APE LLC has never been registered in any capacity with the Commission.

13.    **ARM Capital Management, LLC** is located at 730 Fifth Avenue, 9th Floor, New York, New York.  ARM Management was the commodity pool operator ("CPO") for ARM Capital Partners, LP (the "ARM Pool").  ARM Management filed a registration exemption as an

4

exempt CPO and commodity trading advisor ("CTA") with the National Futures Association

("NFA") on or about December 21, 2007.  Klatch and APE LLC are ARM Management's sole

managers and members.  Klatch was the Managing Director and Chief Investment Officer and

Sullivan was the Managing Director and Chief Marketing Officer.

14.     **TASK Capital Management, LLC** is located at 575 Madison Avenue, 10th

Floor, New York, New York.  TASK Management filed a registration exemption as an exempt

CPO with the NFA on or about January 12, 2009.  Klatch and APE LLC are TASK

Management's sole managers and members.  Klatch was the Managing Director and Chief

Investment Officer and Sullivan was the Managing Director and Chief Marketing Officer of

TASK Management.

15.     **Vigilant Capital Management, LLC** is located in Tampa, Florida.  Vigilant

Management is the CPO for Vigilant Capital Partners, LP (the "Vigilant Pool").  Vigilant

Management filed a registration exemption as an exempt CPO with the NFA on or about

December 16, 2009.  Klatch was Vigilant Management's Managing Director, Chief Investment

Officer, and member.

C.      **Defendants' Activities**

16.     The Court reiterates the findings of fact set forth in the Order of Preliminary

Injunction as follows:

17.     From at least December 2007 to May 2009, Klatch, and (now deceased) Sullivan

on behalf of APE LLC, and ARM Management solicited individuals to invest in, and

misappropriated funds from, ARM Pool.  From at least January 2009 to March 2010, Klatch,

Sullivan on behalf of APE LLC, and TASK Management solicited individuals to invest in, and

misappropriated funds from, the TASK Pool.  Finally, from at least June 2009 to the present,

Klatch and Vigilant Management solicited individuals to invest in, and misappropriated funds from, Vigilant Pool. Collectively, Defendants solicited at least 62 individuals to invest at least $11.3 million into the ARM Pool, TASK Pool, and Vigilant Pool (collectively the "Pools"), while collectively misappropriating over $2.1 million from the Pools.

        1.       **The ARM Pool: December 2007 to May 2009**

        18.      Klatch, Sullivan on behalf of APE LLC, and ARM Management organized the ARM Pool in or around December 2007. ARM Management is the ARM Pool's CPO. Klatch and APE LLC, in turn, are the managers and members of ARM Management.

        19.      Sullivan, on behalf of APE LLC, and ARM Management, knowingly made material misrepresentations to pool participants, including statements that Klatch earned returns of 169% in 2006 with a prior fund and that the ARM Pool had risk controls designed to limit the amount that the Pool could lose in trading its index futures trading strategy. Based on these material misrepresentations, 17 people invested a total of over $5.5 million in the ARM Pool.

        20.      Klatch lost more than $4.9 million trading the ARM Pool. In addition to funds lost in trading, Defendants Klatch, APE LLC and ARM Management took over $563,000 of pool participant funds from the ARM Pool. Based on the losses suffered by the ARM Pool, Klatch, APE LLC and ARM Management were entitled to at most only $355,000 under the fees disclosed in the ARM Pool's PPM and subscription agreements. Therefore, Klatch, APE LLC and ARM Management misappropriated at least $207,000 from the ARM Pool. No pool participants received any funds back from the ARM Pool.

        2.       **The TASK Pool: January 2009 to March 2010**

21.     In or around January 2009, Klatch, Sullivan on behalf of APE LLC, and TASK Management, organized the TASK Pool.  TASK Management was the CPO for the TASK Pool. Klatch and APE LLC, in turn, were members of TASK Management.

22.     Klatch, Sullivan on behalf of APE LLC, and TASK Management knowingly made various material misrepresentations to potential pool participants as well as omitted other material facts.  These misrepresentations included statements that the TASK Pool earned cumulative returns of 242.1% between 1997 and 2008, even though the TASK Pool only began trading in April 2009.  Klatch and Sullivan also told pool participants that the TASK Pool had risk controls in place to limit losses.  Klatch and Sullivan did not tell pool participants of the ARM Pool's losses.  Based on these misrepresentations and omissions, seven people invested a total of over $2.3 million in the TASK Pool.

23.     Similar to the ARM Pool, Klatch's trading resulted in losses of over $1.6 million. Defendants Klatch, APE LLC and TASK Management also withdrew over $669,000 of Pool funds.  Based on the losses suffered by the TASK Pool, Klatch, APE LLC and TASK Management were entitled to only approximately $8,000 in management fees and no performance fees.  Therefore, Klatch, APE LLC and TASK Management misappropriated over $660,000 from the TASK Pool.  Only two pool participants received any funds back from the TASK Pool, totaling only $40,000.

### 3.     The Vigilant Pool: June 2009 to July 2011

24.     Klatch formed the Vigilant Pool in or around June 2009, while still operating the TASK Pool.  Vigilant Management is the Vigilant Pool's CPO.  Klatch is Vigilant Management's Managing Director and Chief Investment Officer.

7

25.     Klatch knowingly made numerous misrepresentations regarding the Vigilant Pool

through investor presentations given to pool participants and through emails. These

misrepresentations included statements in the 2011 Vigilant Pool investor presentation that the

Pool earned 10.2% returns in 2009 and 64.3% returns in 2010. The 2011 investor presentation

states that the Vigilant Pool has suffered no "down months" and that its worst month's

performance was a 1.7% gain. In actuality, from June 2009 to March 2011, the Vigilant Pool

suffered 18 losing months with only four profitable months. Based on these misrepresentations,

at least 36 individuals invested a total of over $3.5 million into the Vigilant Pool.

26.     Similar to the other Pools, the Vigilant Pool has lost over $2.0 million through

trading in futures products, including options on futures. Klatch and Vigilant Management

withdrew over $1.3 million from the Vigilant Pool's bank account. Based on the losses suffered

by the Vigilant Pool, Klatch and Vigilant Management were entitled to at most only $36,000 in

performance and management fees under the terms disclosed in the PPMs and subscription

agreements. Therefore, Klatch and Vigilant Management misappropriated, at a minimum, nearly

$1.3 million from the Vigilant Pool. As of March 31, 2011, 12 pool participants received

approximately $46,000 back from the Vigilant Pool.

27.     Klatch was operating the Vigilant Pool as of the date that the Commission filed

this suit and only ceased operating Vigilant Management when this Court placed it in

receivership.

**4.     Klatch Pled Guilty to Fraud Charges in Connection with the Pools**

28.     On October 28, 2011, Klatch pled guilty to one count each of securities fraud,

wire fraud, money laundering, and conspiracy in connection with Klatch's involvement with the

TASK Pool. The terms of the plea agreement include an admission of facts sufficient to

establish violations of the Act and the Act as amended. The plea agreement states that

> After creating TASK [Capital Partners, LP], Anthony J. Klatch, II,
> Timothy Sullivan, and others solicited individuals to invest in the
> fund. This was done through a variety of means, including, but not
> limited to, providing potential investors with investment
> prospectuses, which contained material misrepresentations and
> material misleading omissions.

Further,

> The remaining 40% percent [*sic*] of money in TASK [not used in
> trading] was used for non-investment related expenditures. This
> includes $180,592.45 which ended up in the personal bank account
> of Anthony J. Klatch, II.

The plea agreement further states that that

> in addition to his involvement in the fraudulent scheme described
> above [the TASK Pool], Anthony J. Klatch, II admits that he was
> involved in similar fraudulent schemes involving American Private
> Equities, LLC, ARM Capital Management, LLC, and Vigilant
> Capital Management, LLC.

Klatch also agreed "to make full restitution as to all relevant conduct regardless of whether it

relates to the count of conviction."

## III.   LEGAL STANDARDS FOR DEFAULTS AND PERMANENT INJUNCTIONS

### A.   Legal Standard for Default Judgment

29.   When a party against whom a default judgment is sought has failed to plead or

otherwise assert a defense, and that fact has been documented, the clerk shall enter the party's

default. Fed. R. Civ. P. 55(a). The party seeking the default shall then apply to the court for a

default judgment. Fed. R. Civ. P. 55(b).

30.   A party may move for a default judgment against an adversary who fails to

answer or appear. Fed. R. Civ. P. 55(b). "Where, as here, 'the court determines that defendant is

9

in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'" *Mendez v. Nooch, Inc.*, 07 Civ. 11174 (LLS)(RLE), 2009 U.S. Dist. LEXIS 25114, 2009 WL 666771, at * 1 (S.D.N.Y. Mar. 6, 2009) (quoting *Lin v. Hayashi Ya II, Inc.*, No. 08 Civ. 6071 (SAS)(AJP), 2009 U.S. Dist. LEXIS 12963, 2009 WL 289653, at *1 (S.D.N.Y. Jan. 30, 2009)). A factual allegation will be deemed not well-pleaded only in "very narrow, exceptional circumstances." *Verizon Directories Corp. v. AMCAR Transp. Corp.*, 05 Civ. 8867 (GBD)(RLE), 2008 U.S. Dist. LEXIS 92037, 2008 WL 4891244, at *2 (S.D.N.Y. Nov. 12, 2008) (citing *TMS Entm't Ltd. v. Madison Green Entm't Sales, Inc.*, 03 Civ. 0517 (GBD) (RLE), 2005 U.S. Dist. LEXIS 18256, 2005 WL 2063786, at *2 (S.D.N.Y. Aug. 16, 2005)).

31.     Defendants have not responded to the Complaint and have not attempted to dispute or defend against the allegations in the Complaint. *See generally* Docket. The Commission's Complaint presents well pleaded allegations of violations of Sections 4b(a)(2)(i) and (iii), 4o, and 4c(b) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), 6o, and 6c(b); Sections 4b(a)(1)(A) and (C), of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C); and Commission Regulations 33.10(a) and (c), 17 C.F.R. §§ 33.10(a) and (c) (2011). Therefore, the entry of default judgment against Defendants is warranted as a matter of law.

**B.     Legal Standard for Permanent Injunction**

32.     Section 6c(b) of the Act, to be codified at 7 U.S.C. § 13a-1(b), provides in pertinent part that "[u]pon a proper showing, a permanent . . . injunction . . . shall be granted without bond." Unlike private actions for equitable relief, a Commission action for injunctive relief is a creature of statute. "In actions for a statutory injunction, the agency need not prove

10

irreparable injury or the inadequacy of other remedies as required in private injunctive suits. A

*prima facie* case of illegality is sufficient." *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir,

1978). *See also SEC v. Prater*, 289 F. Supp. 2d 39, 49 (D. Conn. 2003) (citing *SEC v. Unifund*

*SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990)); *SEC v. Princeton Econ. Int'l.*, 73 F. Supp. 2d 420,

422 (S.D.N.Y. 1999) (applying a less restrictive injunctive standard to actions brought in courts

by SEC and CFTC); *CFTC v. IBS, Inc.*, 113 F. Supp. 2d 830, 848 (W.D.N.C. 2000), *aff'd, CFTC*

*v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir. 2002); *CFTC v. Hunt*, 591 F.2d 1211,

1220 (7th Cir. 1979).

33.     In order to obtain a permanent injunction, "the CFTC must show that 'there is a

likelihood that, unless enjoined, the violations will continue.'" *CFTC v. Kelly*, 736 F. Supp. 2d

801, 804 (S.D.N.Y. 2010) (quoting *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d

Cir. 1986)); *accord SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) ("SEC suits

for injunctions are creatures of statute.  Proof of irreparable injury or inadequacy of other

remedies as in the usual suit for injunction is not required.").  A court may infer a reasonable

likelihood of future violations based on prior violations. *CFTC v. Premium Income Corp.*, 2007

U.S. Dist. LEXIS 94878, at *18 (N.D. Tex. Dec. 28, 2007).  Further, "past illegal conduct is

highly suggestive of the likelihood of future violations." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d

801, 807 (2d Cir. 1975); *see also Hunt*, 591 F.2d at 1220.  A district court may infer a likelihood

of future violations from defendant's past unlawful conduct. *CFTC v. Crown Colony*

*Commodity Options, Ltd.*, 434 F. Supp. 911, 919 (S.D.N.Y.1977).

## IV.    CONCLUSIONS OF LAW

**A.     Elements of Violations of the Act, the Act as Amended by the CRA, and Regulations**

1. **Violations of Sections 4b(a)(2)(i) and (iii) of the Act and Sections 4b(a)(1)(A) and (C) of the Act as Amended by the CRA - Fraud in Connection with Futures**

34.     Sections 4(b)(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), make it

unlawful

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof – (i) to cheat or defraud or attempt to cheat or defraud such other person; [or] (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such person.

35.     Sections 4b(a)(1)(A) and (C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)

and (C), as amended by the CRA, make it unlawful

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person – (A) to cheat or defraud or attempt to cheat or defraud the other person; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

36.     Misappropriation of pool participant funds constitutes fraud under Sections

4b(a)(2)(i) and (iii) of the Act and Sections 4b(1)(A) and (C) of the Act, as amended by the

CRA. *See CFTC v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985).  Defendants -- by

transferring pool participant funds in excess of any earned management and performance fees to

Klatch, APE LLC and the three CPOs, as well as the use of pool participant funds for personal

uses, such as the purchase of a luxury car and a yacht -- violated Sections 4b(a)(2)(i) and (iii) of

12

the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii),  and Sections 4b(a)(1)(A) and (C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), as amended by the CRA.

37.     To establish that Defendants violated Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), and Sections 4b(a)(1)(A) and (C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), as amended by the CRA, through misrepresentations and omissions, the Commission must prove that 1) a misrepresentation or omission was made; 2) with scienter; and 3) that the misrepresentation or omission was material. *See CFTC v. R.J. Fitzgerald & Co.*, 310 F. 3d 1321, 1328-29 (11th Cir. 2002).

38.     Defendants violated Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), and Sections 4b(a)(1)(A) and (C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), as amended by the CRA, by misrepresenting, among other things, the nature and profitability of the investment opportunity.  Such misrepresentations and omissions are material in that a reasonable pool participant would want to know that (1) Klatch lost money trading for a prior fund in 2006; (2) the ARM Pool did not have risk controls in place to protecting pool participants from losses beyond a set risk tolerance; (3) the TASK Pool did not trade until January 2009 and never had a profitable month; (4) the TASK Pool never had more than $2 million under management; (5) the TASK Pool did not have risk management policies in place to prevent large losses; (6) the Vigilant Pool posted significant losses in 2009 and 2010; and (7) previous Pools had lost considerable funds through Klatch's trading.

### 2.     Violation of Section 4o(1) of the Act – Fraud by a Commodity Pool Operator

39.     Section 4o(1) of the Act, to be codified at 7 U.S.C. § 6o(1), broadly prohibits fraudulent transactions by CPOs. Section 4o(1)(A) of the Act, to be codified at 7 U.S.C. § 6o(1)(A) makes it unlawful for a CPO to employ any device, scheme or artifice to defraud any

participant or prospective participant by use of the mails.  Section 4o(1)(B) of the Act, to be

codified at 7 U.S.C. § 6o(1)(B), makes it unlawful for a CPO to engage in any transaction,

practice or course of business that operates as a fraud or deceit upon any participant or

prospective participant by use of the mails.  These sections apply to all CPOs, whether

registered, required to be registered, or exempted from registration.  *See Skorupskas*, 605 F.

Supp. at 932.

      40.     The same conduct that constitutes violations of Section 4b(a)(2)(i) and (iii) of the

Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), and Sections 4b(a)(1)(A) and (C) of the Act as amended by

the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), discussed above, constitutes

violations of Section 4o(1), to be codified at 7 U.S.C. § 6o(1).  *See Skorupskas*, 605 F. Supp. at

932-933.

      **3.**     <u>**Violations of Section 4c(b) of the Act and Regulations 33.10(a) and (c) –**</u>
              <u>**Fraud in Connection with Options**</u>

      41.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b), provides that: "No person shall . . .

enter into or confirm the execution of any transaction involving any . . . option . . . contrary to

any . . . regulation of the Commission."  Regulations 33.10(a) and (c), 17 C.F.R. §§ 33.10(a) and

(c) (2011), provide that

> It shall be unlawful for any person directly or indirectly – (a) To cheat or
> defraud or attempt to cheat or defraud any other person; . . . [or] (c) To
> deceive or attempt to deceive any other person by any means
> whatsoever[,] in or in connection with an offer to enter into, the entry into,
> the confirmation of the execution of, or the maintenance of, any
> commodity option transaction.

Under these provisions, liability for fraud in connection with options is established when a

person or entity 1) makes a misrepresentation, misleading statement, or a deceptive omission; 2)

acts with scienter; and 3) the misrepresentation is material.  *See Fitzgerald*, 310 F.3d at 1328;

14

*CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 446-47 (D.N.J. 2000). The same conduct that violates Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), and 4b(a)(1)(A) and (C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), as amended by the CRA, also violates Section 4c(b) of the Act, to be codified at 7 U.S.C. § 6c(b), and Regulations 33.10(a) and (c), 17 C.F.R. §§ 33.10(a) and (c) (2011). *See, e.g.*, *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 445 (D.N.J. 2000).

**B.     Violations by Defendants of the Act, the Act as Amended, and the Regulations**

42.     The evidence set forth in the record of this case, including the witness declarations and other exhibits appended to the Commission's SRO Motion, show that Defendants violated Sections 4b(a)(2)(i) and (iii), 4o, and 4c(b) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), 6o, and 6c(b); Sections 4b(a)(1)(A) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C); and Commission Regulations 33.10(a) and (c), 17 C.F.R. §§ 33.10(a) and (c) (2011), by, among other things, 1) making material misrepresentations and omissions relating to the profitability of and risk controls in place over the Pools that Defendants managed; and 2) misappropriating at least $2.1 million from those Pools.

**C.     Reasonable Likelihood of Continued Misconduct by Defendants**

43.     The Commission has made its showing of a likelihood of continued misconduct by demonstrating Defendants' clear pattern of fraudulent activity. Defendants operated at least three separate pools over the course of four years, into which they fraudulent solicited pool participants to invest. Further, Defendants misappropriated funds from each of these pools. Finally, Klatch was still operating the Vigilant Pool at the time this suit was filed and only ceased operations when this Court placed Vigilant Management under receivership.

Case 1:11-cv-05191-GBD   Document 31   Filed 03/28/12   Page 16 of 25

44.     The fact that Klatch is in jail awaiting sentencing after pleading guilty to fraud in connection with the TASK Pool does not negate the likelihood of future misconduct for purposes of injunctive relief. As a recent court in this District held, "[t]o allow those with long prison sentences to avoid injunctions would have the perverse effect of rewarding a category of offenders who are particularly culpable." *SEC v. Cobalt Multifamily Investors, LLC*, 2011 U.S. Dist. LEXIS 120215, at *16 (S.D.N.Y. June 14, 2011).

**D.     Klatch is Liable as a Control Person under Section 13(b), to be codified at 7 U.S.C. § 13c(b)**

45.     As a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13(b), Klatch is liable for violations of the Act, the Act as amended by the CRA, and the Regulations by ARM Management, TASK Management, and Vigilant Management. "This provision is construed to include individuals, associations, partnerships, corporations and trusts that exercise control over persons who violate the Act and fail to act in good faith." *CFTC v. Johnson*, 408 F. Supp. 2d 259, 269 (S.D. Tex. 2005). Indeed, "[a] fundamental purpose of section 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995). Pursuant to Section 13(b) of the Act, a controlling person is liable for the violations of any person directly or indirectly controlled if that controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." Section 13(b) of the Act, 7 U.S.C. §13c(b).

46.     To be a controlling person for purposes of Section 13(b) of the Act, a defendant need only possess general control over the operation of the entity principally liable. *R.J. Fitzgerald*, 310 F.3d at 1334. It is sufficient if the defendant "possessed the power or ability to

16

control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993). Whether a defendant had such control depends on all the facts and circumstances. *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002). The fact that a person carries a title suggesting control is insufficient. *See CFTC v. Avco Fin. Corp.*, 28 F. Supp. 2d 104, 114,117 (S.D.N.Y. 1998), *opinion modified*, 1998 WL 524901 (S.D.N.Y. Aug. 21,1998), *and aff'd in part rev'd in part on other grounds by CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) (researcher with title of "vice president," who helped produce software used in fraud, was not controlling person). *See also Paracor Fin., Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1163-64 (9th Cir. 1996) (chief executive officer was not controlling person under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), with regard to corporation's debenture offering and, thus, CEO was not secondarily liable to investors for any securities fraud that occurred in debenture offering).

47.     Once control is established, "A controlling person acts in bad faith if he 'did not maintain a reasonably adequate system of internal supervision and control over the [employee] or did not enforce with any reasonable diligence such system.'" *Johnson*, 408 F.Supp.2d, at 269 (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). The controlling person must act recklessly; establishing negligence alone is insufficient to support liability. *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 959 (5th Cir. 1981) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 n.28 (1976)).

48.     To establish the "knowing inducement" element, the Commission must show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *Johnson*, 408 F.Supp.2d at 269 (quoting

17

*JCC, Inc.,* 63 F.3d, at 1568). Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *In re Spiegel,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988). Indeed, constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *See JCC, Inc*, 63 F.3d, at 1568. To support a finding of constructive knowledge, the Commission must show that a defendant "lack[ed] actual knowledge only because [he] consciously avoided it." *Id.* at 1569 (citations omitted).

49.     Klatch was a controlling person of ARM Management, TASK Management and Vigilant Management. First, Klatch had the requisite control of these entities, evidenced by his control over bank and trading accounts, as well as his role in soliciting pool participants, and his role as Managing Director and Chief Information Officer. Second, Klatch knew of and participated in the fraudulent conduct committed by ARM Management, Task Management, and Vigilant Management. In particular, Klatch knew that he was receiving pool participant funds in excess of the amounts properly earned as performance and management fees outlined in the PPMs. Furthermore, Klatch knew that investor presentations included fraudulent statements regarding the overrepresentation of his success, (169% in 2006) as well as the length of time he had been trading (since 1997). Klatch's receipt of pool participant funds in excess of the amounts properly earned as performance and management fees outlined in the PPMs, and his involvement in soliciting pool participants for the TASK and Vigilant Pool, show that Klatch knowingly induced ARM Management, TASK Management and Vigilant Management in their violations of the Act, the Act as amended, and the Regulations.

**E.     Liability Under Section 2(a)(1)(B) of the Act, to be codified at 7 U.S.C. § 2(a)(1)(B), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011)**

18

50.     Klatch, as well as other employees and agents, committed the acts and omissions described herein within the course and scope of their employment at ARM Management, TASK Management, and Vigilant Management.  Sullivan, as well as other employees and agents, committed the acts and omissions described herein within the course and scope of their employment at APE LLC, ARM Management, and TASK Management.  Therefore, APE LLC, ARM Management, TASK Management, and Vigilant Management are liable under Section 2(a)(1)(B) of the Act, to be codified at 7 U.S.C. § 2(a)(1)(B), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011) as principals for their agents' acts, omissions or failures as they relate to violations of the Act, the Act, as amended by the CRA, and the Regulations.

## V.     RELIEF GRANTED

**A.     Permanent Injunction and Trading Prohibition Against Defendants**

51.     Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission has made a showing that the Defendants have engaged in acts and practices which violated Sections 4b(a)(2)(i) and (iii), 4o, and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), 6o, and 6c(b); Sections 4b(a)(1)(A) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C); and Commission Regulations 33.10(a) and (c), 17 C.F.R. §§ 33.10(a) and (c) (2011).  Unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act, the Act as amended by the CRA, and the Regulations.  Based on the conduct described above, the Court enters an injunction against the Defendants permanently restraining, enjoining, and prohibiting them from directly or indirectly:

A.     engaging, directly or indirectly, in conduct that violates Sections 4b(a)(1)(A) and (C) of the Act, as amended by the CRA and the Dodd-

19

Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010) to be codified at 7 U.S.C. §6b(a)(1)(A) and (C); Sections 4<u>o</u> or 4c(b) of the Act, 7 U.S.C. §§ 6<u>o</u>, 6c(b); or Regulations 33.10(a) and (c), 17 C.F.R. §§ 33.10(a) and (c) (2011).

B.   trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a);

C.   entering into any transactions involving futures, options, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011)), (commodity options), security futures products and/or foreign currency (as described in Section 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)), (forex contracts) for their own personal account or for any account in which they have a direct or indirect interest;

D.   having any futures, options, commodity options, security futures products and/or forex contracts traded on their behalf;

E.   controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving futures, options, commodity options, security futures products and/or forex contracts;

20

F.      soliciting, receiving or accepting any funds from any person for the purpose

of purchasing or selling any futures, options, commodity options, security

futures products and/or forex contracts;

G.      applying for registration or claiming exemption from registration with the

CFTC in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission except as

provided for by Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

H.      acting as a principal (as that term is defined in Regulation 3.1(a), 17

C.F.R. § 3.1(a) (2011)), agent or any other officer or employee of any

person registered, exempted from registration or required to be registered

with the Commission except as provided for by Regulation 4.14(a)(9), 17

C.F.R. § 4.14(a)(9) (2011).

**B.      Restitution**

52.     The Court's authority to order restitution is ancillary to the Court's authority to

order injunctive relief under Section 6c of the Act, 7 U.S.C. § 13a-1. This authority is founded on

the well-established legal principle articulated by the Supreme Court in *Porter v. Warner*

*Holding Co.*:

> Unless otherwise provided by statute, all the inherent equitable
> powers of the District Court are available for the proper and
> complete exercise of that jurisdiction. And since the public interest
> is involved in a proceeding of this nature, those equitable powers
> assume an even broader power and more flexible character than
> when a private controversy is at stake. Power is thereby resident in
> the District Court, in exercising this jurisdiction, "to do equity and
> to mould each decree to the necessities of the particular case."

*Porter*, 328 U.S. 395, 398 (1946) (citations omitted).  The Court reaffirmed this principle in

*Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 296 (1960), where it found that the

21

district court had jurisdiction to order an employer to reimburse employees for lost wages in a suit by the Secretary of Labor to restrain violations of the Fair Labor Standards Act. "'[T]he comprehensiveness of [the court's] equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable reference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'" *Id.* at 291 (quoting *Porter*, 328 U.S. at 398).

   53.     The Second Circuit has followed these principles in granting broad equitable powers to district courts in enforcement matters brought by federal agencies. *See, e.g., SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) (stating that a district court has broad equitable power to fashion appropriate remedies). A district court's authority to grant a permanent injunction also includes the power to grant other ancillary relief including the power to order a defendant to pay restitution. *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 66 (2d Cir. 2006). Likewise, district courts have followed these same principles in allowing the CFTC to seek restitution on behalf of defrauded customers. *See CFTC v. Rolando*, 589 F.Supp.2d 159, 172-73 (D. Conn. 2008) (citing *CFTC v. United Investors Group, Inc.*, 440 F. Supp. 2d 1345, 1359 (S.D. Fla. 2006) ("The Court has authority to order restitution as ancillary equitable relief.") (internal quotation omitted), *rev'd in part on other grounds*, 541 F.3d 1102 (11th Cir. 2008); *CFTC v. Commercial Hedge Servs., Inc.*, 422 F. Supp. 2d 1057, 1060 (D. Neb. 2006) (holding that law is well settled that court has authority to order restitution under the ancillary relief provision in 7 U.S.C. § 13a-1); *CFTC v. Midland Rare Coin Exch., Inc.*, 71 F. Supp. 2d 1257, 1264 (S.D. Fla. 1999) (holding that the CFTC may seek restitution in order to compensate victims of fraud)).

22

54.     Because of the egregious nature of Defendants' fraud and the substantial financial losses that Defendants have caused their victims to incur, the Court exercises its equitable powers to find Defendants liable for restitution to make their victims whole.

55.     However, because the Receiver is still determining the amount of funds received by Defendants and any prior return of funds to pool participants, it is inappropriate at this time to determine the actual amount of restitution. The Court will order the specific amount of restitution after receiving a final report from the Receiver with a full accounting of Defendants' activities and upon motion by the Commission.

**C.     Civil Monetary Penalty**

56.     Section 6c(d)(1) of the Act, as amended by the CRA, provides that "the Commission may seek and the Court shall have jurisdiction to impose . . . on any person found in the action to have committed any violation, a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. §13a-1(d)(1). The Commission Regulations adjust the statutory civil monetary penalty of $100,000 for inflation. *See* 17 C.F.R. § 143.8 (2011). For the period at issue, the statutory civil monetary penalty was $130,000 per violation (for violations committed prior to October 23, 2008) and $140,000 per violation (for violations committed thereafter). *Id.*

57.     The Court finds that Defendants are liable to pay CMP for violations of the Act, the Act as amended by the CRA, and the Regulations. However, the Court reserves final determination of the amount of CMP until such time that the Receiver has completes a full accounting of Defendants' activities and is able to determine Defendants' total monetary gain. Once the Receiver has submitted a final accounting to the Court, the Commission shall submit a recommendation as to the amount of CMP and this Court shall make a final determination of

23

CMP.  The Commission reserves its right to recommend a CMP based on any formula provided for by the Act, as amended by the CRA, and the Regulations.

**D.      Miscellaneous Provisions**

58.      **Statutory Restraining Order and Receivership**:  This Court's prior Order Granting Plaintiff's Emergency *Ex Parte* Motion for Statutory Restraining Order, Expedited Discovery, Preliminary Injunction and Other Equitable Relief (Dkt. No. 9), as extended and supplemented by this Court's Order of Preliminary Injunction Against Defendants (Dkt. No. 25), remains in full force and effect, as amended by the present Order.

59.      The Court determines that the continued appointment of the Receiver, Mark Silverio, is warranted.  The Receivership shall continue until such time as the Court dissolves it, whether upon motion of the Receiver or the Commission.

60.      The Receiver is hereby instructed to liquidate assets under the control of the Receivership, including but not limited to Klatch's personal assets, and to liquidate such assets in such a way as he reasonably believes will maximize their value.  The Receiver is instructed to maintain the proceeds of such assets for purposes of providing restitution to Defendants' victims in a manner to be determined by this Court at a future date.

61.      **Equitable Relief**:  The equitable relief provisions of this Order shall be binding upon Defendants and any person who is acting in the capacity of agent, employee, servant, or attorney of Defendants, and any person acting in active concert or participation with Defendants, who receives actual notice of this Order by personal service or otherwise.

62.      **Notices**:  All notices required to be given to the CFTC by any provision in this Order shall be sent certified mail, return receipt requested, as follows: Notice to CFTC: Attention

24

- Director of Enforcement, Commodity Futures Trading Commission, Division of Enforcement, 1155 21st Street N.W., Washington, DC 20581.

  63. **Continuing Jurisdiction of this Court:** This Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.

**SO ORDERED**, this _____ day of _____ **MAR 28 2012** _____, 2012, at New York, New York

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE

25